In re ESTATE OF Alfred
E. SMITH, Deceased.

Jean L. SMITH, Administratrix C.T.A.
of the Estate of Alfred E. Smith,
Deceased,

v.

Carol SANDT, Joy Youpa, Barbara
Kressley and Diana Kressley.

In re ESTATE OF Alfred
E. SMITH, Deceased.

Jean L. SMITH, Administratrix C.T.A.
of the Estate of Alfred E. Smith,
Deceased,

v.

Carol SANDT, Joy Youpa, Barbara
Kressley and Diana Kressley.

Appeal of Willard KRESSLEY,
Exceptant.

Superior Court of Pennsylvania.

Argued Nov. 12, 1996.
Filed April 30, 1997.

Paul J. McGinley, Allentown, for Smith.

Martin J. Danks, Slatington, for Barbara, Diana and William Kressley.

Erich J. Schock, Allentown, for Sandt and Youpa, appellees.

Before CIRILLO, President Judge Emeritus, and DEL SOLE and OLSZEWSKI, JJ.

DEL SOLE, Judge:

This is an appeal and cross-appeal from the decree of the Court of Common Pleas of Lehigh County, Orphans' Division, denying Appellant Jean Smith's and Cross–Appellant Willard Kressley's exceptions and entering a final decree in favor of Appellees. We affirm in part and reverse in part.

On May 7, 1994, Appellant's husband, Alfred E. Smith (Decedent), committed suicide in the basement of the couple's home. Prior to his suicide, Decedent took the following steps in an effort to attend to several of his personal affairs. On May 5, 1994, Decedent drafted four checks in various amounts to four individuals: Joy Youpa (Decedent's girlfriend), Carol Sandt (Ms. Youpa's sister), Barbara Kressley (Decedent's sister), and Diana Kressley (Decedent's niece). On May 6, 1994 Decedent prepared and executed a holographic will. The will contained the following contested provision: "I want Willard Kressley to have the option of buying my '66 Corvette from Jean [Appellant] for $12,000." Also on May 6, 1994, Decedent mailed the checks to his sister and niece accompanied with a suicide note.[1] On May 7, 1994, before committing suicide, Decedent delivered the checks to his girlfriend and her sister by leaving the checks under a pizza box on their kitchen table. The two mailed checks and the note were received on May 9, 1994, two days after the suicide. Each of the recipients knew of Decedent's death at the time she cashed her check.

After Appellant, as administratrix of Decedent's estate, discovered that Decedent had written the four checks, she requested that the funds be returned by the recipients to the estate. The four recipients refused and Appellant commenced a civil action alleging conversion and seeking restitution. The civil action was transferred to Orphans' Court for disposition in connection with pending matters.

The court entered a decree holding that the four checks to the donees were valid gifts causa mortis and that Mr. Kressley was not entitled to the Corvette. Appellant and Cross–Appellant filed exceptions to the decree nisi which were denied. These appeals followed.

■ When reviewing a final order of the Orphans' Court, we accord the findings the same weight and effect as the verdict of a jury; we will not disturb those findings absent manifest error; we may modify the decree only if the findings upon which the decree rests are not supported by competent or adequate evidence or if there has been an error of law, an abuse of discretion, or a capricious disbelief of competent evidence. *In re Benson,* 419 Pa.Super. 582, 615 A.2d 792 (1992).

■ The issue presented by Appellant for our review is whether Decedent's death revoked gifts of checks which Decedent had written, but which were not negotiated until after his death. The lower court held that the gifts were not revoked because they were valid gifts causa mortis. Trial Court opinion 4/26/96, p. 4.

■ To establish a gift causa mortis, it must be shown that at the time of the alleged gift, the decedent intended to make a gift, the decedent apprehended death, the res of the intended gift was either actually or constructively delivered, and death actually occurred. *In re Ream's Estate,* 413 Pa. 489, 490, 198 A.2d 556, 557 (1964) It is not

---

1. The note stated:

I know this is a hell of a mess and I am truly sorry for the embarrassment, but I can't go on. I know there will be legal questions about the will, but they are my intentions. I know the estate taxes for the state could have been avoided, but I don't have time. *I'm sorry. I'm sorry. I'm sorry.*
　　Good-bye
　　Alfred
Barbara,
　　The checks are [to] use at your discretion.
　　Alfred

necessary that the donor expressly say he knows or believes he is dying, that may be inferred from the attendant circumstances. It will suffice if at the time the gift was made, the donor believed he was going to die, that he was likely to die soon; and death did actually ensue within a reasonable time thereafter. *Titusville Trust Co. v. Johnson,* 375 Pa. 493, 499, 100 A.2d 93, 97 (1953).

The facts of the instant case support a finding of a gift causa mortis. On May 5, 1994, Decedent wrote and executed the four checks to four separate individuals in various specific amounts. On May 6, 1994, Decedent mailed two of the checks, accompanied by a note of suicide. On May 7, 1994, Decedent physically delivered the other two checks, and then, sadly, took his own life. All of the requisite elements of a gift causa mortis have been established. Therefore, the lower court was correct in refusing to revoke the checks.[2]

■ Next, Cross–Appellant Willard Kressley questions whether the lower court properly concluded that the portion of Decedent's holographic will granting Cross–Appellant the option to purchase Decedent's '66 Corvette at a reduced price was merely a request and not a mandatory obligation of Decedent's estate.

■ The intention of the testator is of primary importance. So that that intention shall be given full expression, it can be denied only where it is unconstitutional, unlawful, or against public policy. *In re Estate of Janney,* 498 Pa. 398, 446 A.2d 1265 (1982). To ascertain this intent, a court must examine the words of the instrument and, if necessary, the scheme of distribution, the circumstances surrounding the execution of the will and other facts bearing on the question. *Estate of Reynolds,* 494 Pa. 616, 432 A.2d 158 (1981). When interpreting a will, every word and clause must be given effect if reasonably possible, and the interpreting court cannot ignore the language of the testator, except where the language of the entire will demon-

strates that the language in question was inadvertently used and did not express the testator's true intent. *Estate of Rush,* 426 Pa.Super. 119, 626 A.2d 602 (1993). *Estate of McKenna,* 340 Pa.Super. 105, 489 A.2d 862 (1985).

Decedent constructed his holographic will so that it first listed particular items which Decedent wished to be gifted to certain individuals or which those individuals had the option to purchase. Among those items, Decedent's will contained the following provision: "I want Willard Kressley to have the option of buying my '66 Corvette from Jean for ($15,000.00 scratched out and initialled) $12,000". These provisions were followed by a clause leaving the residuary of the estate to Decedent's wife.

The lower court held that the language used in the holographic will regarding the disposition of the '66 Corvette rose only to a request and did not constitute a mandatory obligation upon the Estate Administratrix to give the property to Cross–Appellant.

However, our courts have held that the option to buy is a direct gift of the property itself, and such specific legatee must be made whole before the residue and remainder will be divided. *See In re France's Estate,* 352 Pa. 522, 43 A.2d 139 (1945) (An option to buy corporate stock, given to testator's son by will, constituted a direct gift of the stock to the son, requiring that he be made whole before division of residue and remainder of testator's estate).

By using the particular language and placing the provision where he did, Decedent intended that Cross–Appellant's option be interpreted as a direct gift of the '66 Corvette before the residue and remainder of the estate was divided. The court lacked competent and adequate evidence to find otherwise. Therefore, we reverse the portion of the decree denying Cross–Appellant's exceptions regarding the disposition of Decedent's '66 Corvette.

2. We believe that by considering gifts made in contemplation of suicide to be gifts causa mortis, we further the public policy against suicide since the donor may retrieve the gifts if the suicide is not completed. As our courts have held, a gift causa mortis differs from other gifts only in that it is made when the donor believes he is about to die, and is revocable should he survive. *Titusville Trust Co. v. Johnson,* at 497–498, 100 A.2d at 96. *See, In re Brown's Estate,* 489 Pa. 199, 413 A.2d 1083 (1980).

Decree reversed in part and affirmed in part. Jurisdiction relinquished.

CIRILLO, J., files a concurring and dissenting opinion.

CIRILLO, President Judge Emeritus, concurring and dissenting.

I agree that Mr. Kressley is entitled to receive the 1966 Corvette as a direct gift under the decedent's will. I vehemently disagree, however, with the majority's incomplete analysis and inaccurate conclusion that the decedent made valid *gifts causa mortis* of the four checks. For this reason, I would reverse that portion of the trial court's decree affirming the gift of the checks to the intended donees.

A recitation of the details behind the death of the decedent is needed for a complete understanding of the lack of the proper donative intent for valid *gifts causa mortis*. On May 7, 1994, appellant's husband, Mr. Alfred E. Smith, committed suicide in the basement of the their Allentown home. Decedent's expired body was found lying on a 3 × 6 foot piece of carpet, his head resting on a throw pillow.

Prior to his death, decedent wrote four checks to four different individuals in varying amounts. He left two of the checks on a kitchen table, under a pizza box, in the home of one of the donees. The remaining checks were mailed to the donees by the decedent. All four checks were dated May 5, 1994; two of the donees received their checks on May 7th, the remaining on May 10th. On May 9th, two donees cashed their checks, another donee cashed hers on May 10th and the last cashed her check on May 11th. Each recipient, at the time she cashed her check, knew that Mr. Smith had passed away.

After Appellant discovered that decedent had issued the four checks, she, as administratrix of decedent's estate, requested that the recipients return the check proceeds to the estate. When the four donees refused, Appellant instituted a civil action alleging conversion and seeking restitution.

On December 12, 1995, Judge Robert Young entered a decree determining, among other things, that the four contested checks were valid *gifts causa mortis*.[1] Appellant and cross-appellant filed exceptions to the *decree nisi, see* Pa.R.C.P. 227.1, which were denied.

In reviewing this appeal, I am mindful of our court's standard of review: when reviewing a final order of the Orphans' Court, we accord the decision the same weight as that of a jury verdict. *In re Estate of Fleigle,* 444 Pa.Super. 632, 664 A.2d 612 (1995) (*en banc*). "[A]s an appellate court[,] we can modify an Orphans' Court decree only if the findings upon which the decree rests are not supported by competent or adequate evidence or if there has been an error of law, an abuse of discretion, or a capricious disbelief of competent evidence." *Id.* at 637, 664 A.2d at 615 (citation omitted).

The question of whether the evidence of a gift satisfies the legal standard is always a question of law for the court's determination. *Titusville Trust Co. v. Johnson,* 375 Pa. 493, 100 A.2d 93 (1953). To constitute a complete "gift," there must be a purpose to give, expressed in words or signs and executed by the actual delivery of the thing given to a donee or someone for the donee's use. *Id.* at 496–98, 100 A.2d at 96. A *gift causa mortis* is defined as:

A gift made when the donor **believes he is about to die,** ... and a gift made by a person **in his last illness, or in danger of death,** subject to the implied condition that if the donor shall recover, of if the donee die[s] first, the gift shall be void, ... and a **gift made in contemplation of death** with the right to revoke if the donor should survive.

17 P.L.E. § 11 (emphasis added). A claimant of a *gift causa mortis* has the burden of proving the requisite elements of such a gift by **clear, direct, precise, and convincing evidence.** *In re Ream's Estate,* 413 Pa. 489, 198 A.2d 556 (1964). A *gift causa mortis* differs from other gifts, namely *inter vivos*

---

1. The term "causa mortis" is Latin for "in contemplation of approaching death." Black's Law Dictionary 200 (5th ed. 1979).

gifts, only in that it is made when the donor believes he is about to die and is revocable if he survives. *Titusville,* 375 Pa. at 493, 100 A.2d at 93. Accordingly, the element of delivery requires the same proof for an *inter vivos* gift or a *gift causa mortis. McHale v. Toole,* 258 Pa. 293, 101 A. 988 (1917).

The testimony reveals the following uncontroverted facts: all four checks were written by decedent before his death; all four checks, before decedent's death, were either put into the U.S. mail or left in a donee's home, by decedent, for the donees; there was no consideration given for the checks; all donees knew of the decedent's death at the time they cashed the checks; and, the checks were not cashed until after the decedent's death.

In *In Fleigle Estate,* 13 Fid.2d 141, *affirmed on other grounds,* 444 Pa.Super. 632, 664 A.2d 612 (1995) (*en banc*),[2] the court of common pleas was faced with a situation factually similar to the present case. In *Fleigle,* the decedent had committed suicide and left a gift of two checks, to donees, on the counter in his own apartment. The court found that the checks, which were not negotiated by the donees until *after* the death of the decedent, were sufficiently delivered and that a valid *gift causa mortis* existed. Accordingly, the Fleigle estate was not entitled to recover the funds represented by the checks.

The court of common pleas' decision in *Fleigle's Estate,* while not binding authority on this court, is the only Pennsylvania case addressing the situation of a *gift causa mortis* where the donor has died by committing suicide. Although the appellant and the trial court fail to discuss whether a decedent who commits suicide can have the requisite intent necessary to feel that he or she is making a gift "in contemplation of death," I find that an answer to this question is central to a determination of whether a *gift causa mortis* was made in the present case. It is the majority's cursory reference to this issue that compels me to dissent and express my views on the far-reaching and negative effects that this case will have on the law of this Commonwealth.

It is well established that a *gift causa mortis* is premised upon the fact that the donor/decedent *must* be making the gift while **in his last illness or in "periculo mortis."**[3] *Michener v. Dale,* 23 Pa. 59 (1854). Our supreme court has held that a conditional gift made by a soldier going off to war is not a valid *gift causa mortis;* such a donor is not "under apprehension of death." *Linsenbigler v. Gourley,* 56 Pa. 166 (1867). A gift while a donor is in full health has also been declared void for purposes of establishing a gift of bonds as a *donatio causa mortis. Stockham's Estate,* 6 Dist. 196 (1897). It should be noted, however, that in order for a donor to be "in apprehension of death," one's illness need not be so extreme as in the case of proving an oral will made by a testator in his last sickness, before witnesses, and then later reduced to writing. *See Stackhouse's Estate,* 23 D. & C. 322 (1935) (even though decedent was optimistic concerning her recovery from illness at the time she gave a car as a gift to a donee, decedent did "act in apprehension of death" and gift was valid *donatio causa mortis* when donor died two days later); *see also Lawrence v. Hartford Nat. Bank and Trust Co.,* 24 Conn.Supp. 419, 193 A.2d 506 (1963) (gift need not be made while decedent confined to bed; valid *gift causa mortis* made when 72 year-old woman, suffering a serious hip fracture, died after having surgery; surgery was made necessary by a present disease).

Because the intention to commit suicide may be readily abandoned at one's own will, courts from other jurisdictions have taken the position that the contemplated or intended suicide of a donor is not a "peril, ailment or disease" which can serve as the foundation

---

**2.** On appeal in *Fleigle's Estate,* our court did not address the issue of whether the trial court properly determined the existence of a valid *gift causa mortis.* Instead, the appellant presented the following issues to our court:

    (1) Whether the executor had standing to appeal the Orphan's Court order, and

(2) Whether the Orphans' Court erred in ruling that the decedent's handwritten note was not a codicil to his will.

**3.** This term is Latin for "in danger of death."

of a *gift causa mortis.* 60 A.L.R.2d § 2 at 577; *see also Ray v. Leader Federal Savings & Loan Assoc.,* 40 Tenn.App. 625, 645, 292 S.W.2d 458, 467 (1953) ("[s]ickness, peril and danger, as used in definitions of donations *causa mortis* we believe to mean something other than a determination of an individual who is presumed to be well, physically and mentally, to take his life.").[4] *See also* 38 Am.Jur. 2D *Gifts* § 10 (1968); Black's Law Dictionary 1286 (5th ed. 1979) (suicide is "[s]elf-destruction; the deliberate termination of one's existence."). Courts, therefore, have found that gifts made in contemplation of suicide are against public policy and should not be enforced. *See, e.g., Ray, supra.*

The Pennsylvania Supreme Court has held that the law does not look with favor upon *gifts causa mortis;* these gifts are often made without the regular safeguards afforded by the law for the disposition of property in an executed will. *Hawn v. Stoler,* 208 Pa. 610, 57 A. 1115 (1904). In keeping with this view, strict proof is required to find that such gifts exist.[5]

Without any instructive guide from case law of this jurisdiction on the issue of gifting in contemplation of suicide, I am forced to broaden my search and delve into Pennsylvania's general public policy with regard to condoning the commission of suicide. My research locates a case which briefly discusses this jurisdiction's view on suicide. In *Commonwealth v. Root,* 191 Pa.Super. 238, 156 A.2d 895 (1959), the court, in dicta, outlined the civil ramifications of suicide and the general policy concerns behind taking life at one's own hands. The *Root* court stated:

> If a man's negligence contributes to his injury or death, he, or those claiming under him, cannot recover damages in a civil suit. It has long been the policy of the common law that one who fails to look out for his own safety is not entitled to demand in court that he be compensated for the consequences of his failure.... **The policy of the law is to protect human life, even the life of a person who wishes to destroy his own.**

*Id.* at 244, 156 A.2d at 899–900 (emphasis added).

Pennsylvania's policy of protecting human life is further evidenced by the criminalization of assisted suicide in our Criminal Code. *See* 18 Pa.C.S.A. § 2505 (causing or aiding suicide). Unlike the majority, I find that it would be prudent to adopt the reasoning of other jurisdictions that render alleged *gifts causa mortis* void when they are made in

---

4. I recognize that there are jurisdictions that would find that contemplation of suicide is sufficient for purposes of proving an element of a *gift causa mortis. See Scherer v. Hyland,* 75 N.J. 127, 380 A.2d 698 (1977); *see also Berl v. Rosenberg,* 169 Cal.App.2d 125, 336 P.2d 975 (1959) (public policy against suicide will not invalidate and otherwise valid *gift causa mortis* ); *In re Van Wormer's Estate,* 255 Mich. 399, 238 N.W. 210 (1931) (melancholia ending in suicide sufficient to sustain a *gift causa mortis* ). These courts have focused on the fact that according to modern human psychological principles, the utter despair attendant upon one contemplating suicide may reasonably be viewed as even more imminent than a person struggling with a fatal physical illness. Such reasoning is attenuated, at best, in light of this Commonwealth's consistent views disfavoring suicide.

5. In this case, the trial court stated that:

> The holographic Will, the method of preparing for his [Alfred E. Smith's] death with a pillow and carpeting, the suicide note and these checks all point to the conclusion that these were gifts *in causa mortis. See Fleigel's [sic] Estate,* 13 Fid.2d 141 (1993) and supporting cases cited in the Sandt/Youpa Brief. The Civil Action is therefore dismissed.

The trial court's reference to *Fleigle* is misplaced. *Fleigle* never attempts to analyze the issue of whether a gift made by a donor who commits suicide is valid for purposes of establishing a *gift cause mortis.* Rather, the court summarily states that "under the particular circumstances of the instant case decedent, aware of his imminent death, effectuated constructive delivery by his act of leaving the checks on the counter, next to his last Will and Testament, in the apartment he shared with [donee], where [donee] would be most likely to find the checks." *Fleigle,* 13 Fid.2d at 147. Other than a singular sentence stating that "at four o'clock a.m. on May 4, 1990, decedent took his life," there is no other evidence of the circumstances surrounding the decedent's suicide in *Fleigle. Hawn,* supra. See also *Titusville, supra* (in determining whether a donor believed that he was going to die and was likely to die soon in order to fulfill an element of a *gift causa mortis,* all attendant circumstances, including the nature and extent of the donor's sickness or injuries, his physical condition, his conduct, and anything said to or by him should be considered).

contemplation of suicide. I find further support for adopting this view in light of the strict proof requirement promulgated by our highest state court in order to establish a valid *gift causa mortis,* as well as the disfavored disposition of property outside of a will. Such suicide gifts are not intended to be in apprehension of an impending illness; rather, they are completely voluntary, controlled by the will of the donor, and easily subject to change by the decision to not take one's own life.

In line with my conclusion, I cannot agree with the majority's convoluted reasoning, contained in a mere footnote, which states that:

> We believe that by considering gifts made in contemplation of suicide to be *gifts causa mortis,* we further the public policy against suicide since the donor may retrieve the gifts if the suicide is not completed.

By upholding and validating gifts made in contemplation of suicide, the majority rewards the donor and his or her donees for the intended and successful completion of a self-destructive act. Furthermore, in response to the majority's above-quoted language, I find that it is just as reasonable to conclude that a donor's intent to commit suicide while in the process of disposing of his or her property is as strong as, if not stronger than, his or her intent to retrieve and repossess the gifts upon a change in one's will to commit the act. The majority's holding cuts against the notion that courts prefer the reliable disposition of property through a will or by the well-expressed intentions in a living person's *inter vivos* transfer.

I, therefore, respectfully dissent.

